**Affirm in part; Opinion Filed March 4, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00088-CV

**EASTON RUTKOSKI, KYLE PALMER, ROBERTO GONZALEZ, AND EPIC ERA
INCORPORATED, Appellants
V.
EVOLV HEALTH, LLC AND EVOLVHEALTH MEXICO SERVICOS, S. DE R.L. DE
C.V., Appellees/Cross-Appellants
V.
MATT STEFFE AND TRAVIS BOTT, Cross-Appellees.**

**On Appeal from the 68th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-13-13499**

## MEMORANDUM OPINION
Before Justices Bridges, Evans,[1] and Whitehill
Opinion by Justice Evans

Easton Rutkoski, Kyle Palmer, Roberto Gonzalez, and Epic Era Incorporated ("Epic")

appeal from a judgment rendered after a jury verdict. The jury did not find misappropriation of

trade secrets, the main theory tried by Evolv Health, LLC, and EvolvHealth Mexico Servicos, S.

De R.L. De C.V. ("Evolv Health" and "EvolvHealth Mexico," respectively; together "Evolv").

Instead, the jury found liability and damages against appellants for tortious interference (Epic,

$3,000,000 damages), breach of contract (Gonzalez, $540,000 damages plus $968,000 attorney's

---

[1] The Honorable David Evans, Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired,
sitting by assignment.

fees), and breach of fiduciary duties (Gonzalez, $540,000 damages; Rutkoski, $3,500; and Palmer, $4,000; Epic aiding and abetting as to each). The trial court entered judgment for each amount found by the jury against the parties found liable.

Rutkoski, Palmer, Gonzalez, and Epic timely perfected this appeal filing a single brief on behalf of all appellants. Evolv timely perfected a cross-appeal contesting a summary judgment in favor of Matt Steffe and Travis Bott.

Appellants challenge the judgment in four issues. In their first issue, they challenge the trial court's grant of partial summary judgment arguing a release did apply to Gonzalez. In the three remaining issues, appellants challenge the sufficiency of the evidence supporting each claim on which the judgment is based. In the sole issue in its cross-appeal, Evolv contends the trial court erred when it granted Steffe and Bott's motions for summary judgment because it filed more than a scintilla of evidence in response to so those motions. We affirm the trial court's judgment in all regards except we conclude there is insufficient evidence of the $3 million awarded against Epic for tortious interference but there is sufficient evidence of $1.2 million, so we suggest a remittitur of $1.8 million. If remittitur is not filed, we will reverse and remand the tortious interference claim against Epic for a new trial.

## I. BACKGROUND

Because the parties know well the background facts and the standards of review and applicable law is well settled, we issue this memorandum opinion "focus[ing] on the basic reasons why the law applied to the facts leads to the court's decision." *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006); *see* TEX. R. APP. P. 47.2(a), 47.4.

Evolv Health is a Dallas-based company that sells health products through a multi-level marketing structure. Evolv Health operated in Latin America through an indirect subsidiary, EvolvHealth Mexico. Both sides describe Evolv Health's multi-level marketing structure as

"sponsorship trees" where distributors sell product and sponsor more distributors below them in the tree, called the "downline." Distributors in the downline also sell product and sponsor more distributors below them creating their own downline and extending the downline of the distributors above them. Distributors are paid a commission on product they sell and also on sales generated by their downline.

Rutkoski, Palmer, Guillermo Fernando Rovzar Diez Barroso known as Billy Rovzar, Kevin Keranen, and Matt Steffe joined Evolv Health in February 2012 as a result of Evolv Health's acquisition of cPrime, another multi-level marketing company. Also in 2012, Evolv Health hired Travis Bott as vice-president. Rutkoski, Palmer, Keranen, and Bott were employees. Rovzar was a distributor. Bott ceased direct employment and became a distributor at the beginning of June 2013. During the spring 2013, Evolv negotiated with Rovzar to form a joint venture.

Near the end of June while on a cruise for top-performing Evolv distributors, Evolv management became concerned about Steffe and Bott spreading negative information about Evolv in an effort to recruit away Evolv's top distributors. Around the same time, Evolv Health International and Rovzar formed the joint venture to take over and expand Evolv's Latin America market. They also formed EvolvHealth Mexico, which was owned fifty-one percent by Evolv Health International and forty-nine percent by Rovzar. Rovzar served as chief executive officer, and Roberto Gonzalez was hired as president or chief operations officer of EvolvHealth Mexico. In early July, approximately one week after forming the entities, Evolv suspended Juan Carlos Barrios, the distributor whose revenues were approximately fifty percent of Evolv's Latin American sales. Barrios departed and took with him his extensive downline and went to a marketing company unaffiliated with any party in this suit. Meetings occurred from June through early August between Steffe, Bott, Gonzalez, and others related to and resulting in the formation of Epic on August 8, 2013.

–3–

From August through the fall of 2013, many of Evolv's distributors terminated their relationships with Evolv and established business relationships with Epic, taking with them their downlines. During August, Rovzar informed Evolv he wanted to terminate his relationship. On August 22, 2013, Evolv Health International, LLC and Rovzar terminated their joint venture. During August 2013, Rutkoski and Palmer began employment with Epic while continuing their employment with Evolv, drawing pay from both. In early September, Rutkoski resigned his employment with Evolv. EvolvHealth Mexico's product inventory was $1.2 million at that time. Despite Evolv's requests, Gonzalez did not take acts that allowed Evolv to access EvolvHealth Mexico's offices or bank accounts or acquire the documents or the $1.2 million inventory. Evolv never acquired the $1.2 million inventory or documents and determined there was no money remaining in the bank accounts. When Gonzalez abruptly resigned from EvolvHealth Mexico, he took his executive team to Epic. In September and October, Evolv filed lawsuits, including this one, alleging numerous causes of action. Evolv lost almost all of its Latin America distributors and revenue that it made the basis of its lawsuits.

## II. ANALYSIS

### A.  Appellants' Challenge to the Summary Judgment Dismissing Gonzalez's Counterclaim for Release

In appellants' first issue, they challenge the trial court's summary judgment that a release did not apply to Gonzalez. Evolv and Gonzalez filed cross-motions for summary judgment on Gonzalez's counterclaim for declaratory judgment in which he asserted he was released from liability for conduct occurring on or before August 22, 2013 because he was included in the release in the Termination Agreement between Evolv Health International and Rovzar.[2] Gonzalez's

---

[2] Evolv cautiously interprets certain "affirmative defense" statements in appellants' brief as challenging the trial court's granting of partial summary judgment disposing of fourteen affirmative defenses. Evolv argues that because appellants' brief does not contain an argument with citation to the record and supporting authorities to challenge the summary judgment on the fourteen affirmative defenses, they have inadequately briefed that challenge citing *Wilhoite*

pleading stated that "because Gonzales is a 'member, officer . . . managing member, employee' of Evolv Health Mexico" he was "subject to this release that accrued upon entry of the Termination Agreement." In its cross-motion for summary judgment, Evolv argued that "the release does not refer to [Gonzalez] by name or with such descriptive particularity that [his] identit[y] or [his] connection with any tortious event is not in doubt, such that a stranger could identify [him] as released parties." Regarding Gonzalez being an officer and employee of EvolvHealth Mexico, which was a direct, fifty-one percent-owned subsidiary of Evolv Health International, Evolv further argued, "Officers and employees of Evolv International's subsidiaries and parent are not a released class listed in the release, and members and managing members are not a released class listed in the release." The trial court granted Evolv's motion and denied Gonzalez's disposing of Gonzalez's claim of release. On appeal, neither party argues about the summary judgment evidence, but they dispute the meaning of the release paragraph in the Termination Agreement.

"We review a summary judgment de novo." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When parties dispute their contract's meaning, "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "In the usual

---

*v. Sims*, 401 S.W.3d 752, 760-61 (Tex. App.—Dallas 2013, no pet.). It is true we must consider all arguments made under an issue even those outside the scope of the issue as framed. *See* TEX. R. APP. P. 38.1(f), 38.9; *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 863 (Tex. 2005). Release is an affirmative defense. *See* TEX. R. CIV. P. 94. Gonzalez pleaded his affirmative defense as a counterclaim for declaratory judgment claiming he was released from liability to Evolv. (Even Evolv in the title of the summary judgment motion characterized the release as an affirmative defense, although in the body of their motion Evolv correctly dealt with it as a counterclaim for declaratory judgment on the release). As Evolv asserts, under their first issue in a few places appellants challenge the summary judgment granted against Gonzalez's "affirmative defense," each time in the immediate context of discussing the release. Because appellants' use of "affirmative defense" is in the singular, "affirmative defense" is always in the immediate context of the release, and Gonzalez pleaded his affirmative defense of release as a counterclaim for declaratory judgment on the release, there is only one possible construction of appellants' brief and that is their entire argument under their first issue is limited to the counterclaim of release. They do not challenge the summary judgment on the fourteen affirmative defenses. On the other hand, if appellants' statements in their brief are construed to challenge the summary judgment on the fourteen affirmative defenses, we agree with Evolv that no argument with citation to the record or authorities is presented to demonstrate how and regarding which of the fourteen affirmative defenses the trial court erred in granting summary judgment, so nothing is presented for our review. *See* TEX. R. APP. P. 38.1(h), (i); *Wilhoite*, 401 S.W.3d at 760-61.

case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls." *Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). We "presume parties intend what the words of their contract say"—*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)—and interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "When examining an unambiguous contract, courts must construe the meaning of the language used in the contract. When the language is plain, it must be enforced as written." *Phillips v. Union Bankers Ins.*, 812 S.W.2d 616, 618 (Tex. App.—Dallas 1991, no writ) (citing *Republic Nat'l Life Ins. Co. v. Spillars*, 368 S.W.2d 92, 94 (Tex. 1963)).

Appellants generally argue in their brief that as a director, officer, or employee of EvolvHealth Mexico, Gonzalez was one of Rovzar's directors, officers, or employees. Therefore, appellants reason, Gonzalez was included in the release, and the release covered the claims in this lawsuit. Evolv responds that Gonzalez was the director, officer, or employee of the Joint Venture's entities, such as EvolvHealth Mexico, and as such he was not Rovzar's director, officer, or employee. Evolv further argues, that even if Gonzalez were included in the release, the release is limited to disputes "arising from the Terminated Agreements," and none of the claims in this lawsuit "aris[e] from the Terminated Agreements." We need only decide whether Gonzalez was Rovzar's director, officer, or employee to resolve this issue.[3]

The release in the Termination Agreement provided:

---

[3] Evolv also responds in its brief that Gonzalez did not argue in his motion for summary judgment that he was included in the release by being Rovzar's director, officer, or employee, so that cannot be a basis to reverse the summary judgment. We do not agree. Evolv is correct only that Gonzalez did not argue in his motion for summary judgment any basis to decide the release included Gonzalez. However, in Gonzalez's response to Evolv's motion for summary judgment he made every argument appellants now assert on appeal regarding the release.

Further, each of the parties [Rovzar and Evolv Health International] for itself and its successors, assigns, heirs, agents, representatives, owners, directors, members, officers, partners, managing members, employees, shareholders, consultants, advisors, predecessors, experts, and attorneys hereby *release the other party, its directors*, *officers*, shareholders, *employees*, assigns, successors, and agents, from all causes of action, liabilities, damages, judgments, liens, debts, sums of money, accounts, including any loss of profits, indirect, direct, special or consequential damages or any other loss incurred or suffered, in law or equity *arising from the Terminated Agreements*.

(Emphasis added). The text's inclusion of the parties' "directors, officers, shareholders, employees, assigns, successors, and agents," plainly describes several classes of persons released. But the text of the release does not include subsidiaries or entities owned in whole or in part by the parties, nor does it include such entities' directors, officers, or employees. So the plain text of the release does not include directors, officers, or employees of entities Rovzar partially owned, such as officers or employees of EvolvHealth Mexico such as Gonzalez.

Appellants' textual argument is that if "its directors, officers, . . . [and] employees" did not mean Gonzalez as a director, officer, or employee appointed by or hired by Rovzar to work for EvolvHealth Mexico, then that interpretation would render the inclusion of directors, officers, and employees "meaningless or superfluous." Evolv responds that it was possible for Rovzar to hire people to function as his personal directors, officers, or employees, and had Rovzar done so then those people would be released. Thus, Evolv argues, the language has meaning even if Gonzalez is not one of those people because there is no summary judgment evidence that Gonzalez was in such a relationship with Rovzar.

For several reasons, we reject appellants' textual argument. As we stated above, the text of the release does not include directors, officers, or employees of entities owned in whole or in part by the releasing parties, such as officers, directors, and employees of EvolvHealth Mexico. This conclusion is tacitly admitted by appellants' argument that interpreting the clause literally renders it "meaningless or superfluous" precisely because it does not apply to Gonzalez. In

–7–

addition, appellants do not cite any authority, nor are we aware of any, supporting appellants'

argument that each class of released persons must apply equally to both sides of a mutual release

if the text of the release uses one list of the classes of people released for both sides as this release

does. Nor are we aware of authority that each class of persons must actually apply to existing

people or the release is "meaningless or superfluous." Accordingly, for appellants to show

Gonzalez is included in the release, they must show Gonzalez directly worked for Rovzar

personally as a director, officer, or employee.

To characterize Gonzalez as Rovzar's director, officer or employee, appellants argue

Rovzar had the right to appoint two of the five directors for each of the companies in the Joint

Venture. Further, paperwork identified Gonzalez as appointed by Rovzar to be an officer (Chief

Operations Officer) and director and member of the board of directors of EvolvHealth Mexico.

Appellants also argue Rovzar funded the Joint Venture entities, Rovzar was a 49% equity owner

of the Joint Venture entities, and Rovzar had operational control of EvolvHealth Mexico because

he was responsible for managing daily operations, including hiring, training, and payroll.[4]

Appellants sum up their argument, "In short, for as long as Rovzar jointly owned and fully

controlled the Latin American operation under the Joint Venture Agreement, Gonzalez was

Rovzar's designated director, officer, or employee." They also argue,

> Because the joint-venture documents show that Rovzar jointly owned and fully
> controlled the companies comprising the joint venture—including EvolvHealth
> Mexico—and because Gonzalez was Rovzar's designated director and an officer of
> EvolvHealth Mexico, the trial court should have ruled as a matter of law that

---

[4] Evolv argues appellants rely on trial testimony outside of the summary judgment record to argue under this issue that Rovzar directly paid Gonzalez. Evidence outside the summary judgment record cannot be relied on to evaluate the trial court's summary judgment decision. *See Horton v. Stovall*, No. 05-16-00744-CV, 2018 WL 3359065, at *2 (Tex. App.—Dallas July 10, 2018, pet. filed) ("Unless the appellate record clearly indicates the trial court considered evidence outside the summary judgment record, we will not consider evidence elsewhere" in the appellate record). Contrary to Evolv's contention, however, appellants confined their factual statements under this issue to the summary judgment record. They only state that Rovzar "was responsible for managing daily operations, including hiring, training, and payroll" citing to provisions of the Joint Venture Agreement which they accurately summarize.

Gonzalez was one of Rovzar's "directors, officers,…[or] employees" under the Release.

Viewing the summary judgment record favorably to the non-movant, Rovzar appointed or hired Gonzalez to be a director, officer, and employee of Joint Venture entities and specifically of EvolvHealth Mexico. Rovzar owned a minority (49%) equity ownership of the Joint Venture entities such as EvolvHealth Mexico which Rovzar funded. And Rovzar had operational control of the Joint Venture entities. But the undisputed summary judgment evidence as acknowledged in all parties' briefs was that Gonzalez was *EvolvHealth Mexico's* director, officer, or employee and perhaps served other Joint Venture entities in the same capacities. Contrary to appellants' argument, there is no proof that Gonzalez was *Rovzar's* personal director, officer, or employee. Absent such evidence, appellants cannot overcome the text of the release that does not include directors, officers, or employees of entities wholly or partially owned by one of the parties to the release. Based on this decision, we need not analyze whether the scope of the release covered the claims in this lawsuit to rule against appellants on their first issue.

### B. Appellants' Challenge to the Sufficiency of the Evidence at Trial

In their next three issues, appellants challenge the sufficiency of evidence supporting the jury's verdict. "Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Bustamante v. Ponte*, 529 S.W.3d 447, 455–56 (Tex. 2017). To determine whether there is no evidence of probative force supporting a jury's verdict, we must consider all the evidence in the record in the light most favorable to the verdict and include in our consideration evidence offered by the party opposed to the verdict that supports the verdict. *Id*. at 456. We "must credit favorable evidence if reasonable jurors could, and disregard contrary

–9–

evidence unless reasonable jurors could not," and "every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Id.* (internal quotation marks removed).

"When reviewing an assertion that the evidence is factually insufficient to support a finding, a court of appeals sets aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

In all our sufficiency reviews we bear in mind that, "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

There are no challenges to the charge, so we use the unchallenged charge to measure the sufficiency of the evidence to support the jury's verdict. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009).

### 1.  *Sufficiency of Evidence Supporting Breach of Contract*

In their second issue, appellants challenge the legal and factual sufficiency of the "evidence to support the judgment against Gonzalez for damages and attorney's fees, based on a breach of contract[.]" But in their argument, they also challenge whether Gonzalez was a party to the contract on which Evolv based its suit. We must consider all arguments made not just those identified in the statement of the issue. *See Tittizer*, 171 S.W.3d at 863. Accordingly, we start with appellant's challenge that there is insufficient evidence that Gonzalez was a party to the contract on which Evolv brought suit.

### a. Evidence Gonzalez Was a Party to the Contract

Both at trial and on appeal, Gonzalez acknowledged he was a director, officer, and employee of EvolvHealth Mexico, but he disputed he signed or was otherwise bound by the terms of the Executive Employment Agreement (sometimes abbreviated by the parties as EEA). The series of jury questions about breach of contract began with Question 19 which asked whether Gonzalez entered into the Executive Employment Agreement with EvolvHealth Mexico. The jury was instructed:

> Parties to a contract may include:
> • the signatories to the contract; or
> • those who have authorized another to sign the contract on their behalf; or
> • those who have otherwise indicated their consent to be bound by the contractual promises. A person can indicate consent to be bound by the contractual promises by, for example, accepting payments pursuant to the contract.
>
> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

The jury answered, "yes." In their brief, appellants first assert there was no evidence of any of the matters about which the jury was instructed: no evidence Gonzalez signed the contract, no evidence he authorized someone else to sign it for him, and no evidence otherwise indicating Gonzalez consented to be bound by the contract.

Evolv presented testimony from its chairman, Roscoe White III, that Rovzar told White that Gonzalez had executed the agreement and that it was in EvolvHealth Mexico's files in Mexico City. White testified he could not obtain a copy of Gonzalez's signed contract when the Joint Venture ended even though Evolv Health International was the 51% owner of EvolvHealth Mexico, because they could not get the files returned. Evolv presented evidence that Rovzar and Gonzalez prevented Evolv Health International from obtaining any of the computers, files, product

–11–

inventory, financial data, or anything from EvolvHealth Mexico when the Joint Venture was terminated. An email Rovzar sent to Gonzalez attached a "final document" form of contract. Evolv argues from this evidence that the jury could have decided Rovzar and Gonzalez retained or destroyed the agreement so there would be no evidence of the non-compete obligation. In addition, Evolv also argues the jury had to decide a binary question—either Gonzalez did or did not sign the Executive Employment Agreement—and the jury's rejection of Gonzalez's denial "constitutes additional evidence in support of the jury's finding that he did sign it," citing for support *In re McClendon (McClendon v. Springfield)*, 765 F.3d 501, 505 (5th Cir. 2014) (rejection of defendant's testimony that he did not know defamatory statements were false necessarily supported conclusion that he did know).

Appellants marshal the evidence contrary to the jury's finding: that Evolv did not produce at trial a final, signed copy of the agreement; Gonzalez testified he accepted and countersigned a letter offering employment with EvolvHealth Mexico that did contain compensation terms including a territorial bonus amount but did not contain the non-solicitation and non-compete provisions Evolv alleged were part of the final agreement; Rovzar's email transmitting the Executive Employment Agreement pointed out "the 1% to US Hispanic as additional comp. is missing, we will add this to the final document," indicating the attachment was not the final form of agreement; and Gonzalez testified he had thousands of unopened emails, never opened Rovzar's email transmitting the agreement, and he would not have signed an agreement that omitted part of his compensation (territorial bonus) or one that contained a non-compete agreement. Appellants challenge that an actual contract document sent by email could not be the final version because, although it contained the other terms, it did not contain the territorial bonus.

Appellants' arguments fail based on Gonzalez's admission he was employed by EvolvHealth Mexico, White's testimony that Rovzar told him the signed contract was in the files

–12–

of EvolvHealth Mexico, and the evidence that Gonzalez and Rovzar prevented Evolv Health from obtaining the files and records of EvolvHealth Mexico when the Joint Venture ended. Destruction or otherwise intentionally preventing disclosure of documents as part of the underlying facts of a case supports an inference that the evidence was unfavorable. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305–06 (Tex. 2006). "In light of the favorable verdict, we must assume the jury credited this testimony." *Id*. at 306. Additionally, when evaluating and rejecting Gonzalez's testimony that the offer letter was his employment agreement, the jury was entitled to credit the text of the offer letter that stated, "A contract outlining specifics must be completed prior to the start of your employment," indicating the offer letter was not the contract. The jury was entitled to weigh and reject as self-serving Gonzalez's testimony that he never opened the email transmitting the contract and never would have signed a contract with the terms contained in the unsigned contract transmitted by email.[5] The jury apparently concluded that Gonzalez acquiesced to the terms in the contract Rovzar transmitted by email and signed the document. In summary, the parties each presented evidence about the existence of a contract, neither side presented overwhelming evidence, and the jury chose to credit Evolv's evidence and discredit appellants' evidence. The jury charge correctly instructed the jury, "You are the sole judges of credibility of the witnesses and the weight to give their testimony," and on this record the jurors had no alternative but to do so. But there is legally sufficient evidence and we cannot conclude "that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered" for factual

---

[5] Evolv argues Gonzalez's credibility was damaged as a result of inconsistency with documentary evidence and the lack of credibility of an aspersion he cast on White, both of which are collateral to the contract issue so we do not recite them here.

insufficiency. *Crosstex*, 505 S.W.3d at 615.[6] We reject appellants' argument that there is insufficient evidence Gonzalez entered into the Executive Employment Agreement.

### b.     Challenge to contractual damages of lost profits

Appellants further challenge the judgment for breach of contract by asserting there was legally and factually insufficient evidence of lost profits. The jury was charged to consider only, "[l]ost profits that were a natural, probable, and foreseeable consequence of Gonzalez' failure to comply," when deciding compensatory damages for breach of contract. Appellants argue that EvolvHealth Mexico was the other party to Gonzalez's contract, but EvolvHealth Mexico had no sales so it could not have had lost profits as damages for breach of Gonzalez's contract with it. Evolv argued in its responsive brief that appellants' argument is not preserved for our review because it was not raised in the trial court in the oral and written motions for instructed verdict, motion to disregard jury findings, memorandum in opposition to judgment, or motion for new trial.[7] In their reply brief, appellants did not address preservation of this argument so they have provided no guidance as to where they presented this argument to the trial court and obtained a ruling, thereby preserving their argument.

A party must present its argument to the trial judge and obtain a ruling or a refusal to rule to which the party objects in order to preserve its argument for appellate review. *See* TEX. R. APP.

---

[6] There is also evidence of acceptance by conduct. For example, as to all of Gonzalez's conduct as an employee, Evolv argues the evidence indicates he performed pursuant to the signed contract in the files of EvolvHealth Mexico. Conversely, appellants argue such conduct is consistent with Gonzalez considering the offer letter to be his contract. As to Gonzalez's acceptance of his pay, the parties dispute whether Gonzalez's pay came directly from Rovzar or from funds Rovzar lent to EvolvHealth Mexico. As to all the evidence, appellants argue the equal inference rule applies because the inference is at most equally supportive of either the offer letter or email contract being the contract, so neither can be inferred. *See City of Keller*, 168 S.W.3d at 813 ("When the circumstances are equally consistent with either of two facts, neither fact may be inferred."). It is sufficient to note the evidence of Gonzalez's performance is not inconsistent with our conclusion that the evidence supports the jury's determination that he entered into the agreement.

[7] In summary, Evolv responded on the merits that Evolv Health was transferring its Latin American sales to EvolvHealth Mexico so Evolv's lost profits expert correctly utilized Evolv's financial records when calculating lost profits.

P. 33.1(a); *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003) ("Under Rule 33.1(a)(2) of the Rules of Appellate Procedure, in order to present a complaint for appellate review, the record must reflect that the trial court '(A) ruled on the request, objection, or motion, either expressly or implicitly; or (B) refused to rule . . . and the complaining party objected to the refusal.'"). In other words, "Rule 33.1(a) requires a timely and ruled-upon objection to preserve error." *Seim v. Allstate Texas Lloyds*, 551 S.W.3d 161, 164 (Tex. 2018) (per curiam). There are a very few exceptions to this requirement and none are applicable here. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993) ("Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties.").

We have reviewed the record including those portions Evolv cited as authority for its argument appellants did not preserve their appellate complaint. We have not found where appellants argued or obtained a ruling from the trial judge that there was no evidence of contractual damages of lost profits because there was no evidence EvolvHealth Mexico had revenue. We agree, therefore, with Evolv that appellants' appellate complaint that there was no evidence of EvolvHealth Mexico's revenue to support a lost profits award for contractual damages is not preserved for our review. *See also Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 320 (Tex. App.—Dallas 2009, pet. denied) (party not preserve error when failed to provide record citation showing it raised argument in trial court and obtained ruling).

Appellants further argue Evolv made "no effort to establish causation" so the jury was left to guess about causation of damages resulting from Gonzalez's breach of contract. Appellants made clear, "In short, Defendants complain not about the amount of damages awarded (i.e., apportionment), but about the fact that any damages were awarded at all (i.e., no causation)." In response, Evolv points to evidence that EvolvHealth Mexico had $1.2 million of product in its possession in its Mexico City offices, that Gonzalez's contract obligated him to return all property

upon his cessation of employment and owed Evolv best efforts, and evidence that Gonzalez was complicit with Rovzar in the failure to make that product available for return upon the cessation of the joint venture, including inferential evidence that Rovzar and Gonzalez stole that inventory. (Appellants do not challenge the sufficiency of the evidence with respect to whether Gonzalez's conduct regarding the inventory constituted a breach of the provisions of Gonzalez's employment agreement). Thus, Evolv argues Gonzalez's breach of contract costing Evolv $1.2 million in inventory is evidence of causation flowing from breach that supported the jury's finding of lost profits. Appellants reply that the jury's refusal to find Gonzalez violated the Texas Theft Liability Act or committed conversion precludes consideration of the evidence that Gonzalez stole or otherwise was responsible for failing to return the inventory upon the cessation of the joint venture.

We begin by rejecting appellants' argument that the jury's refusal to find for Evolv on one or more causes of action bars consideration of the evidence that supported the rejected claims when this appellate court reviews the sufficiency of the evidence supporting the jury's affirmative finding as to a different cause of action. Appellants' authority is *Hunter Buildings & Manufacturing, L.P. v. MBI Global, LLC*, 436 S.W.3d 9, 17 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). But in *Hunter*, the court of appeals decided the trial court erred by impliedly disregarding a jury's finding that two officers had zero percentage of responsibility assessing all the responsibility among three entities because the jury's zero percentage finding negated joint and several liability for the only cause of action that could support the judgment—misappropriation of trade secrets. *See id. Hunter* does not support appellants' argument that we should decline to consider evidence supporting one cause of action on which the plaintiff obtained favorable jury findings because the evidence also supported a cause of action rejected by the jury.

We also agree with Evolv's response that there is a direct causal connection between Gonzalez's breach of failing to return or steal the $1.2 million of inventory and Evolv's damages.

–16–

Such evidence is very direct and not only legally sufficient but is so directly related to the breach of duties under the employment agreement that we cannot conclude "that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered" for factual insufficiency. *Crosstex*, 505 S.W.3d at 615. Because there is a direct causal connection between evidence submitted on which the jury could have found Gonzalez breached his contract and the damages, we decide against appellants on their contractual damages arguments.

### c.     *Attorney's fees*

Finally, as to the judgment for breach of contract, appellants argue "the judgment for attorneys' fees should be reversed because there is legally insufficient evidence to support the award." Appellants' legal challenge is that there is no evidence EvolvHealth Mexico incurred attorney's fees. Evolv contends appellants made no objection in the trial court at any stage of the proceedings to the recoverability of attorney's fees on the basis that there was no evidence they were incurred by EvolvHealth Mexico. As we stated above, it is incumbent on an appellant to present to their trial judge an objection or argument and obtain a ruling or refusal to rule to which appellant objects in order to preserve an argument for our review. *See Seim*, 551 S.W.3d at 164 ("Rule 33.1(a) requires a timely and ruled-upon objection to preserve error."). Having reviewed the record, we agree with Evolv that appellants' argument was not presented to, or ruled upon by, their trial judge. Their appellate argument, therefore, presents nothing for us to review.

Appellants' brief states, "To be clear, the issue here is not about a failure to segregate fees. At trial, Evolv's attorney, Robert Arnett, provided expert testimony about fees and generally segregated recoverable fees from unrecoverable fees." Following that unequivocal statement, appellants then complain in their brief that the only claim Evolv's attorney indicated he segregated for was the theft claim, only mentioning breach of contract once in his testimony and then only as

–17–

an example of the type of claims for which fees are recoverable. Appellants' brief argues, "Arnett provided no testimony and no evidence that any fees were incurred to prosecute the contract claim against Gonzalez—or that the contract claim was intertwined with the claim for civil theft." Evolv argues the first quoted statement means appellants do not challenge the award of attorneys' fees on the basis of failure to segregate. Although we find appellants' brief confusing, we liberally construe it in favor of their having argued Evolv failed to segregate its fees. This argument is consistent with appellants' memorandum in opposition to Evolv's motion for judgment on the verdict where they argued by way of example: "Plaintiffs failed to present evidence of those fees incurred on the only claim that could potentially be entitled to attorneys [sic] fees: Gonzalez' breach of contract." Accordingly, appellants preserved this argument for our review.

To resolve this complaint we examine the testimony to which both sides' briefs direct us: Evolv's attorney's fees expert's testimony about segregation. The expert, Mr. Arnett, testified:

> There are other claims that do permit the prevailing party to recover attorney's fees, or at least the prevailing plaintiff, like misappropriation of trade secrets, the Texas Theft Liability Act, breach of contract.
>
> So when you have a case like this that involves some claims that permit the recovery of attorney's fees and other claims that don't permit the recovery of attorney's fees, you've got to do what's called a segregation analysis, which -- and there are different approaches to that. But basically what you're trying to say, okay, if this case had only involved claims where you could recover attorney's fees, what would the fees have been. In other words, if you didn't have to fool with other things that you did that were not related to these attorney's fees-bearing claims, what would the overall fees have been?
>
> Q. Did you perform a segregation analysis in this case?
>
> A. Yes, I did. So I looked at the case overall, and I also took into account the fact that there were some parties who were here, are no longer here. So it was obviously some work done on those claims and parties.
>
> But you look at the case overall, it is essentially a misappropriation of trade secrets case and a conspiracy to commit misappropriation of trade secrets. Plus there's the Texas Theft Liability Act. And the factual discovery or the facts that go to all of the claims are really pretty much the same. So taking all those factors into consideration, I determined that a 25 percent reduction of the overall fee would be appropriate to get to the recoverable fees.

–18–

Q. In other words, 25 percent of what's the resulting fee?

A. It's $968,000.

The jury awarded $968,000 in accordance with Mr. Arnett's testimony.

There were no objections to Mr. Arnett's testimony. Through cross-examination, appellants obtained clarification from Mr. Arnett that his segregation of fees excluded fees related to several different categories of parties that were not in the case by the time of trial. Neither side asked Mr. Arnett to clarify what claim or claims he referred to as "recoverable fees" in his statement, "So taking all those factors into consideration, I determined that a 25 percent reduction of the overall fee would be appropriate to get to the recoverable fees…. $968,000." We disagree with appellants that the context of Mr. Arnett's compressed testimony indicates he was referring to the Texas theft liability act because Mr. Arnett had informed the jury they could award attorney's fees for the breach of contract claim. So we conclude there was legally sufficient evidence of segregated fees and any ambiguity was within the province of the jury to resolve.

Having considered all of appellants' arguments, we decide against them on their second issue.

### 2. Sufficiency of Evidence Supporting Epic's Tortious Interference

In appellants' third issue, they challenge the legal sufficiency of the evidence to support the jury's finding that Epic tortiously interfered with existing agreements. Appellants challenge the evidence of existing agreements that could be the subject of interference, proximate causation of damages, and the $3,000,000 award of damages.

The jury affirmatively answered Question 26 that asked, "Did Epic intentionally interfere with the existing contracts of Plaintiffs?" The jury was instructed:

> To find "Tortious Interference" with an existing contract you must find all of the following:
> 1. The plaintiff had a valid contract;
> 2. The defendant willfully and intentionally interfered with the contract;

–19–

3. The interference proximately caused the plaintiff's injury; and

4. The plaintiff incurred actual damage or loss.

\* \* \*

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

The jury then answered Question 27, which asked the jury to find the damages that resulted from the interference pursuant to the instruction and to consider: "(a) The benefit conferred upon Epic as a result of the interference. (b) The loss suffered by Plaintiffs as a result of Epic's interference." The jury answered, "3,000,000."

Appellants challenge the legal sufficiency of the first and third elements in Question 26 by challenging the existence of valid contracts the interference with which could have proximately resulted in Evolv's loss of contractual rights. Evolv introduced some evidence of each agreement and evidence that each contained confidentiality and non-solicitation provisions. In deciding appellants' second issue, we concluded there was sufficient evidence that Gonzalez had entered into a contract.[8] So we reject appellants' challenge that there was no contract with which Epic could have tortiously interfered.

Appellants also challenge the lack of a direct causal link between Epic's conduct and Evolv's expert's testimony of lost profits pursuant to *Hunter* (discussed below). But before we examine appellants' argument from *Hunter*, we analyze Evolv's complaint that appellants did not preserve any argument about proximate causation in the trial court. Both in the trial court and in their appellate brief, appellants complain Evolv's expert's testimony of a global calculation of Evolv's $5.4 million lost profits lacks a connection to Epic's conduct in causing Evolv to lose specific distributors. We have examined appellants' motions for instructed verdict; judgment notwithstanding the verdict; memorandum in opposition to Evolv's motion for judgment; motion

---

[8] Based on our resolution of appellants' argument there was no evidence of a direct causal link to support lost profits, we do not discuss appellants' further arguments pertaining to contracts other than Gonzalez's contract.

–20–

to reform, correct, and vacate the judgment; and reply memorandum supporting that motion. There are a few instances in which appellants refer to the direct causal link they argue from *Hunter* as proximate causation.[9] Thus, we conclude appellants made arguments in the trial court substantially similar to their argument in their brief about proximate causation:[10]

> But even assuming there was a valid contract between EvolvHealth Mexico and Gonzalez (see Section 2.1, above)—and even assuming Epic interfered with that contract by, for example, inducing Gonzalez to breach the non-compete and non-solicitation provisions by soliciting distributors to leave Evolv and go to Epic—there still is no evidence whatsoever to show that any distributor who was part of Evolv's damages calculation actually left Evolv and went to Epic as a result of Epic's (or Gonzalez's) actions. And with no evidence to show that Epic's interference caused any single distributor to leave, there obviously is no evidence to show that Epic's interference *proximately caused* $3,000,000 in lost profits.

(Emphasis added). From this and their entire argument, we understand appellants do not challenge the sufficiency of the evidence of interference, other than the existence of contracts we discussed above. Further, we understand the end of their statement to mean appellants challenge the lack of evidence of specific distributors Epic or Gonzalez proximately caused to leave Evolv combined with an expert's calculation that aggregated Evolv's lost profits attributable to each of the departed distributors. So Epic's culpability for interference by solicitation of distributors is assumed, but the sufficiency of the evidence that such conduct proximately caused a calculable damage is challenged.

Appellants base their issue on, and urge us to follow, the reasoning and factual analysis of *Hunter*, 436 S.W.3d 9. "Recovery for lost profits does not require that the loss be susceptible of

---

[9] An example where appellants rely on precedent from this court is in their reply memorandum in which they state:

> The Texas Court of Appeals in Dallas has also addressed the required causal link: "In order to sustain a damage award, a plaintiff must secure a jury finding that the damages, including 'lost profits,' were causally linked to the wrongful act of the defendant, whether the standard of causation be proximate cause or producing cause." *Turner v. PV Intern. Corp.*, 765 S.W.2d 455, 464 (Tex. App.—Dallas 1988)[.]

[10] We do not decide whether an argument in the trial court about direct causal connection would or would not be sufficient to preserve an appellate argument about proximate causation because appellants argued direct causal connection as a specific aspect of proximate causation both in the trial court and on appeal.

exact calculation." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *see Hunter*, 436 S.W.3d at 17. But "the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty." *Id.*; *see Hunter*, 436 S.W.3d at 17. "To recover lost profits, the plaintiff must produce evidence from which the jury reasonably may infer that the lost-profits damages for which recovery is sought have resulted from the conduct of the defendant." *Hunter*, 436 S.W.3d at 17 (citing *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995), *abrogated on other grounds by, Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex. 2007)). The *Hunter* court then restated the supreme court's conclusion, which we quote: "This causal nexus requirement is met when a jury is presented with pleading and proof that establish a direct causal link between the damages awarded, the actions of the defendant and the injury suffered." *Bowser Bouldin, Ltd.*, 896 S.W.2d at 181); *see Hunter*, 436 S.W.3d at 18.

In *Hunter*, the court pointed out the expert specifically testified he assumed all the conduct pleaded caused the plaintiff's lost profits, stated repeatedly he was not testifying about causation, and did not account for evidence of other factors that could have resulted in lost profits, such as legitimate competition and reduction of workforce. *Hunter*, 436 S.W.3d at 21. The court summarized:

> There is a fundamental difficulty with [the expert's] testimony. . . . [The expert's] calculation of lost profits was not tied in any way to the portion, if any, of the lost profits which may have been caused by the Defendants' alleged misappropriation of [the plaintiff's] trade secrets, but instead extended globally to all of the Defendants' allegedly actionable conduct. *See Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248 (noting that expert's calculation of lost profits caused by alleged unfair competition improperly presumed that every jar sold was sold through unfair competition and was not tied to the jars sold through conduct actionable under the unfair-competition claim). Under the applicable standard of review and on this record, [the expert's] testimony is legally insufficient to support a finding that the Corporate Defendants' misappropriation of trade secrets proximately caused [the plaintiff] to sustain lost-profits damages in the past.

*Hunter*, 436 S.W.3d at 21 (citing *Bowser Bouldin, Ltd.*, 896 S.W.2d at 181; *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no)).

To succeed in their argument, appellants challenge Evolv's expert's lost profits damages testimony as demonstrating at most that during the relevant time period Evolv lost profits in the amount of $5,400,000 but without connection to departed distributors or Epic's conduct of tortious interference.[11]  Further, appellants assert the lost profits evidence is not connected to individual distributors that departed as a proximate result of Epic's conduct as distinguished from conduct of other defendants.[12]  Appellants point out that there was no testimony from departed distributors as to why they left and there were other reasons distributors and their downline left.  For example, there was evidence that Juan Carlos Barrios—the "Michael Jordan" of distributors—and several other distributors left after they were suspended by Evolv for noncompliance with their agreement not to promote competing products and companies.  There was testimony Barrios solicited for other products and companies because he was unhappy Evolv arranged its joint venture with Rovzar when Barrios derived more than half his revenue from sales in Mexico.  When Barrios left, he joined Jeunesse, not Epic.  And Barrios's suspension and departure in early July 2013 was approximately one month before Epic came into existence in early August 2013 undermining any connection between Epic and Barrios's departure.[13]  As appellants complain, Evolv's damages

---

[11] Appellants adopt by reference their arguments under their second issue challenging Evolv's expert's damages testimony which we did not have to reach in resolving their second issue.

[12] According to appellants, this results from Evolv's emphasis at trial of its central theories of conspiracy to misappropriate trade secrets which did not differentiate damages caused by individual defendants in reliance on the joint and several liability of all co-conspirators for damages caused by the putative conspiracy.  But the jury rejected Evolv's conspiracy theories finding instead Epic individually tortiously interfered with Evolv's existing contracts.

[13] In appellant's reply brief for the first time they articulate their challenge to the sufficiency of the evidence in terms of the temporal impossibility of a connection between Epic, formed on August 8, 2013, and the departure of Juan Carlos Barrios, suspended and departed in early July 2013.  Although this highlights specific facts in the record, both parties discuss in their briefs Epic's formation date and Barrios's departure time frame, so we do not consider it a new issue or new argument.

–23–

expert did not separately calculate lost profits related to Barrios, but both sides point out Barrios brought in approximately fifty percent of Evolv's Latin America revenue exceeding $1.4 million each year. So appellants contend even just the lack of evidence linking Epic to Barrios's departure, let alone lack of proof his departure was proximately caused by Epic, demonstrates a significant amount of the revenue in Evolv's damage calculation is unsupported. Epic urges there is similarly no evidence as to why other distributors left and how much profit their departure cost Evolv in lost profits.

In response, Evolv makes no argument that their damages expert determined the cause of the loss of profits he calculated, nor that the damages expert attributed specific damages to specific departed distributors, or specific damages to Epic's conduct. Nor does Evolv argue there is evidence elsewhere in the record supporting a decision that Epic proximately caused Evolv's distributors to leave. Instead, Evolv argues the jury might have attributed to Epic the loss of Barrios's revenue, which alone would support the $3,000,000 finding, while glossing over the difficulties of proof involving Barrios. Because the record lacks evidence connecting Barrios or any other departed distributor to Epic's conduct with an expert's association of a calculated loss of profits resulting to Evolv, we agree with appellants that the evidence of lost profits is legally insufficient to support the $3,000,000 award against Epic.

But Evolv argues, "[A] substantial portion of the jury's award can be supported based solely on the stolen product inventory," because the jury had evidence connecting Gonzalez's breach of contract to Epic's tortious interference. Indeed, as we pointed out above, appellants do not challenge the evidence supporting tortious interference liability beyond challenging the existence of contracts which we resolved against Epic. Nor did the damages question limit the jury's consideration to lost profits, but instead instructed the jury to consider, "(b) The loss suffered by Plaintiffs as a result of Epic's interference." The evidence showed that $1.2 million of inventory

was not returned or stolen was a loss suffered by Evolv. There was therefore sufficient evidence of a direct causal link between Epic's tortious interference and Evolv's $1.2 million loss supporting the jury's necessary finding of proximate causation.

We have decided there is insufficient evidence of a direct causal link to the $3,000,000 award but sufficient evidence of a direct causal link to $1,200,000 of damages. In such situations, the proper result is to remand the cause to the trial court for a new trial even though appellants brought a legal insufficiency issue. *See Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 837–38 (Tex. 1997) (where no evidence of "direct causal link" to total damage award but sufficient evidence of direct causal link to some damages, appropriate appellate remedy is remand for new trial). However, the court of appeals may suggest a remittitur. TEX. R. APP. P. 46.3. "If part of a damage verdict lacks sufficient evidentiary support, the proper course is [for the court of appeals] to suggest a remittitur of that part of the verdict. The party prevailing in the trial court should be given the option of accepting the remittitur or having the case remanded." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 124 (same). Consequently, we suggest a remittitur of $1,800,000 of the damages awarded by the trial court against Epic for tortious interference. As the prevailing party at trial, appellees must be given the option of accepting the remittitur or having the case remanded for a new trial. *See* TEX. R. APP. P. 46.3; *Larson*, 730 S.W.2d at 641; *McLeod v. Gyr*, 439 S.W.3d 639, 650 (Tex. App.–Dallas 2014, pet. denied).

We resolve appellants' third issue in their favor to the extent that the evidence does not support $3,000,000 of damages awarded by the trial court. If the suggested remittitur of $1,800,000 is timely filed, we will modify and affirm the judgment in accordance with the remittitur. *See* TEX. R. APP. P. 46.3; *McLeod*, 439 S.W.3d at 650. However, if the remittitur is not

timely filed, we will reverse the judgment and remand for a new trial. *See* Tᴇx. R. Aᴘᴘ. P. 46.3; *McLeod*, 439 S.W.3d at 650.

### 3. *Sufficiency of Evidence Supporting Breach of Fiduciary Duties*

In their fourth issue, appellants assert the record does not contain any evidence supporting the jury's damages verdict against Gonzalez, Palmer, and Rutkoski for breaches of fiduciary duties and against Epic for aiding and abetting. Questions 13 (Palmer and Rutkoski) and 15 (Gonzalez) asked the jury to find the amount of damages resulting from each individual's breach of fiduciary duty, instructing the jury as follows:

> Consider the following elements of damages, if any, and none other:
> a. The loss suffered by Plaintiffs as a result of Defendant's breach.
> b. The benefit conferred upon Defendant as a result of the breach.

In answer to Question 13, the jury found $3,500 and $4,000, respectively, for Rutkoski and Palmer. Fulfilling their ethical duties of candor to the court, appellants' counsel admit those amounts roughly equal three weeks' pay received by Rutkoski and Palmer from Epic when they were dual employees of Evolv and Epic in violation of their fiduciary duties as employees of Evolv. This supported the jury's award for the "benefit conferred upon Defendant(s) as a result of the breach," in accordance with the jury's instruction "b" on damages for breach of fiduciary duties. Appellants argue in their brief the benefit to appellants must have injured Evolv, but we measure the sufficiency of the evidence by the unchallenged charge, which did not include that requirement in instruction "b." *See Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 112. We therefore focus our analysis on the judgment against Gonzalez for breach of fiduciary duties in the amount of $540,000 and Epic for aiding and abetting.

Challenging the sufficiency of the evidence supporting instruction "a," appellants reurge their arguments regarding the insufficiency of the evidence supporting lost profits. We discussed and agreed with appellants' argument when analyzing their third issue. But again Evolv responds

that they are not limited to lost profits from loss of distributors, but their loss of $1.2 million in inventory with evidence of Gonzalez's responsibility for that loss as a breach of his fiduciary duties is evidence that supports the jury's finding of $540,000 for Gonzalez's breach of fiduciary duty. We agree with appellees that instruction "a" to Question 15 instructed the jury to consider the "loss suffered by" Evolv, which would include Evolv's loss of $1.2 million of inventory. So, we conclude there is sufficient evidence to support the jury's award of $540,000 based on instruction "a."

Appellants' only other argument as to Gonzalez pertains to instruction "b": "there is no evidence to support a finding that [Gonzalez] received any 'improper benefit' as a result of his conduct that could support $540,000 in damages for breach of fiduciary duty." We need not address whether the law requires any benefit to be an improper benefit because such a requirement was not included in the unchallenged instruction "b." *See Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 112.

Appellants also challenge the sufficiency of the evidence to support the jury's decision that Epic aided and abetted Rutkoski, Palmer, and Gonzalez's breaches of fiduciary duties. Appellants, however, seek only to apply to Epic any favorable ruling we may have made resulting from their challenges to Rutkoski, Palmer, and Gonzalez. Having rejected those appellate arguments, there is nothing further for us to review. Therefore, we have considered and rejected appellants' arguments in their fourth issue and conclude the judgment as to the breaches of fiduciary duties should be affirmed.

### C. Evolv's Cross-appeal challenging the Summary Judgment Dismissing Breach of Contract Claims against Steffe and Bott

In Evolv's sole cross-issue, they challenge the summary judgment granted in favor of Steffe and Bott on each of their combined traditional and no-evidence motions. Evolv contends

they timely filed evidence raising a genuine issue of material fact. We do not agree, so we affirm the trial court's summary judgment.

We must affirm a summary judgment if any of the grounds asserted in the motion are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). When traditional and no-evidence grounds are combined, we first review the no-evidence grounds. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If an appellate challenge fails to demonstrate the nonmovant produced more than a scintilla of evidence on one essential element of a cause of action challenged by a no-evidence motion, we affirm the summary judgment and need not analyze other grounds including traditional grounds. *See id.*; TEX. R. CIV. P. 166a(i). We consider the evidence in the light most favorable to the non-movant, drawing every reasonable inference from the evidence in favor of the non-movant. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

Steffe and Bott each moved for summary judgment on two grounds, one of which we analyze. They argued there was no evidence that Steffe and Bott acknowledged receipt of, and agreed to, Evolv Health's Statement of Policies and Procedures ("ESPP"). The parties agree the ESPP contained the confidentiality and non-compete agreements on which Evolv based its breach of contract claim against Steffe and Bott.

Evolv claims Hicks's summary judgment affidavit created a fact issue about whether Steffe and Bott had agreed to the ESPP as a part of online registration to be distributors. Hicks stated in his affidavit,

> Matt Steffe was an Evolv distributor and was bound by the Evolv Health, LLC Statement of Policies and Procedures ("ESPP"), a true and correct copy of which is attached hereto as Exhibit 72. Steffe had to agree to be bound by the ESPP in order to complete his registration as an Evolv distributor.
>
> * * *

As a distributor Bott was bound by the ESPP, and had to agree to be bound by the ESPP in order to complete his registration as an Evolv distributor. Registration is generally accomplished online and the registration cannot be completed until the distributor checks a box agreeing to be bound by the ESPP, similar to checking a box to agree to the terms of a license when downloading software.

Exhibit 72 was a copy of the ESPP with an effective date of September 12, 2012. Steffe and Bott argue that Hicks's statements are not more than a scintilla of evidence, "Hicks fails to support this statement with any evidence that Steffe and Bott actually did check the box and agree to the ESPP," Hicks does not state that "Steffe or Bott actually agreed to the ESPP by checking a box," and Hicks did not provide supporting evidence that would corroborate his statements making them non-conclusory. For the following reasons, we agree Hicks's statement does not amount to more than a scintilla of evidence.

Neither party disputes contracts formed over the Internet by requiring a person to click-through various acknowledgements, sometimes called click-through agreements, can be valid, enforceable contracts when adequately proven in court. *See, e.g., Bundy v. Houston*, No. 01-17-00863-CV, 2018 WL 6053602 (Tex. App.—Houston [1st Dist.] Nov. 20, 2018, no pet.) (mem. op.) (by clicking on and electronically signing a document that included Terms and Conditions with forum selection clause plaintiff became bound by forum selection clause). In order to prove-up a click-through agreement, a party *may* present detailed statements explaining the click-through process and provide copies of what appears on the screen of a person's device ("screen prints") and the resulting documentation in a company's file. *See, e.g., Kyäni, Inc. v. HD Walz II Enters., Inc.*, No. 05-17-00486-CV, 2018 WL 3545072, at *1 (Tex. App.—Dallas July 24, 2018, no pet.) (mem. op.) (admissibility of evidence of click-through agreement containing arbitration clause). Steffe and Bott contend this level of detail is required in order to prove-up a click-through agreement. Evolv contends Hicks's statements in his summary judgment affidavit is sufficient.

Hicks states, "Registration is generally accomplished online." "Generally" means "in most cases; usually" and "in general terms, without regard to particulars or exceptions." *Generally*, NEW OXFORD AMERICAN DICTIONARY 722 (3d ed. 2010). So Hicks's statement means in most cases, without particular reference to Steffe or Bott, distributors registered online using the click-through agreement to the ESPP. Nowhere does Hicks state that Steffe and Bott registered online, used the click-through agreement, or otherwise agreed to the ESPP. Hicks does not testify whether Steffe and Bott agreed to become distributors before or after the effective date of the version of the ESPP as of September 2012, and if they became distributors before September 2012 whether there was an ESPP and what terms it contained. Evolv is correct that Hicks's statement, "registration cannot be completed until the distributor checks a box agreeing to be bound by the ESPP," means persons who registered online had to click-through the agreement to be bound by the ESPP. We take as true the non-movant's evidence, but that statement does not convey the meaning that Steffe and Bott went through the online distributor registration. Rather, it means if they had gone through the online registration then they would have had to agree to the ESPP. There being no evidence of Steffe and Bott's contractual agreement to the ESPP and that being the underpinning of their liability on Evolv's theory of breach of contract, we affirm the trial court's grant of summary judgment in Steffe and Bott's favor.

## III. CONCLUSION

For these reasons, we resolve appellants' first, second, and fourth issues against them and appellees' sole issue on cross-appeal against them. We resolve appellants' third issue in their favor to the extent of suggesting remittitur of $1,800,000 of the award of $3,000,000 of damages against Epic for tortious interference with existing contractual relations awarded by the trial court. In accordance with rule of appellate procedure 46.3, if appellees file with this Court within fifteen (15) days from the date of this opinion a remittitur of $1,800,000 of damages against Epic for

tortious interference with existing contractual relations, we will modify the trial court's judgment to award appellees $1,200,000 in damages against Epic for tortious interference with existing contractual relations, and affirm the trial court's judgment as modified. If the suggested remittitur is not filed timely, we will reverse the trial court's judgment against Epic for tortious interference with existing contractual relations and remand that cause of action for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 46.3.


/David Evans/
DAVID EVANS
JUSTICE

170088F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

EASTON RUTKOSKI, KYLE PALMER, ROBERTO GONZALEZ, AND EPIC ERA INCORPORATED, Appellants

No. 05-17-00088-CV     V.

EVOLV HEALTH, LLC AND EVOLVHEALTH MEXICO SERVICOS, S. DE R.L. DE C.V., Appellees/Cross-Appellants

V.

MATT STEFFE AND TRAVIS BOTT, Cross-appellees

On Appeal from the 68th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-13-13499.
Opinion delivered by Justice Evans, Justices Bridges and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part.

We suggest a remittitur in the amount of $1,800,000 with respect to the trial court's damages award of $3,000,000 to appellees for their tortious interference claim. In accordance with Texas Rule of Appellate Procedure 46.3, if appellees file with this Court within fifteen (15) days from the date of this opinion a remittitur of $1,800,000, we will modify the trial court's judgment to award appellees $1,200,000, along with pre- and post-judgment interest, for damages on their tortious interference claim and affirm as modified. If the suggested remittitur is not timely filed, we will reverse the trial court's judgment with respect to appellees' tortious interference claim and remand that claim to the trial court for further proceedings consistent with this opinion.

We **AFFIRM** the trial court's judgment in all other respects.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 4th day of March, 2019.